# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **QUENTON L. NUNN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 5:14-CV-2488-MHH** |
| | } | |
| **CITY OF HUNSTVILLE** | } | |
| **ALABAMA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

Plaintiff Quenton Nunn is a former employee of the City of Huntsville, Alabama and the Huntsville Madison County Mental Health Center. After working part-time for the City as a bus driver, Mr. Nunn worked for the Mental Health Center as a full-time bus driver pursuant to the terms of a contract between the Mental Health Center and the City of Huntsville. Under the agreement between the Mental Health Center and the City, Mr. Nunn transported Mental Health Center clients to and from the center, and he also drove City residents who participated in the City's Handi-Ride program.

The Mental Health Center terminated Mr. Nunn's employment in July 2014 because Mr. Nunn did not get a leave request form signed before he took time off to attend a religious conference. According to Mr. Nunn, the City, as his joint-employer, failed to accommodate his request for time off to attend the conference

and retaliated against him for attending the conference by terminating his employment or causing the Mental Health Center to do so. Mr. Nunn asserts claims against the City for failure to accommodate his religious beliefs under Title VII and § 1983, First Amendment retaliation under § 1983, and retaliatory discharge under Title VII.[1]

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Mr. Nunn and the City have filed cross motions for summary judgment. (Doc. 67; Doc. 71). For the reasons explained below, the Court grants in part and denies in part both motions, and the Court asks the parties for supplemental briefing with respect to Mr. Nunn's Title VII retaliation claim.

## I.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

---

[1] Mr. Nunn also asserted claims against the Mental Health Center and David Willige. (Doc. 1; Doc. 57). The Court has dismissed Mr. Nunn's claims against these defendants. (Doc. 19; Doc. 65). This memorandum opinion concerns Mr. Nunn's claims against the City of Huntsville only.

motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal quotation marks and brackets omitted) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)). "If both parties proceed on the same legal theory and rely on the same material facts . . . the case is ripe for summary judgment." *Georgia State Conference of NAACP*, 775 F.3d at 1345 (internal quotation marks omitted) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)).

"If the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no

genuine issue of material fact as to any element of that defense." *International Stamp Art, Inc. v. U.S. Postal Service,* 456 F.3d 1270, 1274 (11th Cir. 2006).

## II. FACTUAL BACKGROUND

Mr. Nunn is a Jehovah's Witness. (Doc. 66-7, pp. 17-18). He has been an elder at his Kingdom Hall for 10 years. (Doc. 66-7, pp. 18-19, 23). As an elder, Mr. Nunn has administrative responsibilities that require, for example, that he work as an attendant at district conventions. (Doc. 66-7, pp. 20-21). Annual district conventions take place in June or July. (Doc. 66-7, pp. 22, 81). Mr. Nunn has a "spiritual obligation" to participate in district conventions. (Doc. 66-7, p. 81).

In 2009, the City of Huntsville hired Mr. Nunn as a part-timer driver for one of the City's Handi-Ride buses. (Doc. 66-7, p. 84; Doc. 66-8, p. 116). The City's Department of Parking and Public Transit operates the Hand-Ride paratransit program which is a public transportation service for individuals with disabilities who cannot use the City's traditional shuttle service. (Doc. 66-1, p. 39; Doc. 66-2, p. 23). In September 2011, pursuant to the terms of a contract that the Huntsville Madison County Mental Health Center entered with the City, the Mental Health Center hired Mr. Nunn as a full-time bus driver to transport center clients to and from daily treatments at the facility and to transport City Handi-Ride customers.

(Doc. 66-5, pp. 29-30; Doc. 66-6, pp. 3-4; Doc. 66-7, pp. 50-52, 84).[2] The contract that was in effect when the Mental Health Center hired Mr. Nunn in 2011 is not in the record, but the 2012 and 2013 agreements are, and those agreements between the Mental Health Center and the City outline each party's responsibilities under the agreement and each party's relationship to and responsibilities for supervision of Mr. Nunn. (Doc. 66-2, pp. 6-23).[3]

Under the contract between the Mental Health Center and the City, the City's Public Transit department provided Mr. Nunn with the bus that he drove. (Doc. 66-2, pp. 8, 17). The Mental Health Center agreed to employ Mr. Nunn and was "responsible for all withholding taxes, any health insurance, workmen's compensation insurance and any other employee benefits." (Doc. 66-2, pp. 9, 18). The Mental Health Center also agreed that Mr. Nunn "will meet the same employment criteria established by the policies and procedures of Public Transit." (Doc. 66-2, pp. 9, 18). The Mental Health Center agreed that the City's Paratransit Coordinator would supervise Mr. Nunn. (Doc. 66-2, pp. 9, 18) (stating that "the day-to-day management of the driver under this agreement will be the responsibility of Public Transit.").

The contract contained a provision regarding Mr. Nunn's work schedule and

---

[2] Mr. Nunn kept his part-time position with the City until he resigned his position with the City effective March 29, 2013. (Doc. 66-8, pp. 116-117; Doc. 70-1, pp. 1-2).

[3] The Mental Health Center and the City have entered similar contracts since at least 2005. (Doc. 66-4, pp. 86-87).

leave.  That portion of the agreement states:

> The Center agrees that the driver will work the established Public Transit work schedule which may include some holidays that the Center may be closed.  In the event the Center employed driver is unavailable because of scheduled leave, holiday approved off, alternate duty assignments required by the Center or during the interim between the termination of employment and hiring an acceptable replacement, Public Transit will assign a substitute driver in his or her place and will bill the Center at a substitute driver's established wage rate for the hours of service provided in place of the Center employed [d]river.  The Paratransit Coordinator must be consulted and have prior concurrence with the approval of scheduled leave including Center holidays when the driver may normally be assigned to work.  The Paratransit Coordinator must be notified as soon in advance as possible but at least two weeks in advance of any alternate duty assignments that will temporarily remove the driver from active participation [in his or her duties under the contract].

(Doc. 66-2, pp. 9, 18).

Consistent with the terms of the contract, Mr. Nunn began his work day at the City garage where he picked up his bus and received information about his daily route.  (Doc. 66-7, pp. 55-57).  Public Transit provided Mr. Nunn with a daily manifest listing each Mental Health Center passenger and each City Handi-Ride passenger with a corresponding pick up and drop off time.  (Doc. 66-2, ¶ 7; *see* Doc. 66-2, pp. 25-36; Doc. 66-7, pp. 56-57).  Mr. Nunn dropped off Mental Health Center clients by 9:00 or 10:00 a.m. each morning.  (Doc. 66-7, p. 58).  Mr. Nunn then dropped off City Handi-Ride passengers at various locations, including a municipal gym, dialysis centers, and doctors' offices.  (Doc. 66-7, pp. 60-61).  Mr. Nunn returned to the Mental Health Center to take those passengers home.  Then,

Mr. Nunn transported other City riders. (Doc. 66-7, pp. 65-66). At the end of his shift, Mr. Nunn returned to the City garage where he parked his bus at 4:00 p.m. each day. (Doc. 66-7, pp. 66-67, 71).

David Willige, the City's Paratransit Coordinator, was Mr. Nunn's supervisor with respect to the duties he performed for the City. (Doc. 66-1, p. 81; Doc. 66-3, p. 56; Doc. 66-7, p. 74). Maxie Kirk, the Mental Health Center's Recovery Services Program Manager, was Mr. Nunn's supervisor with respect to the duties he performed for the Mental Health Center. (Doc. 66-3, pp. 87-88; Doc. 66-5, pp. 18, 23; Doc. 66-7, p. 54).

In May 2013, Ms. Kirk approved Mr. Nunn's request for time off the following month on June 20, June 21, and June 24. (Doc. 66-5, pp. 203-04, 262). Ms. Kirk told Mr. Willige that Mr. Nunn would be off on June 24, but she did not tell him that Mr. Nunn also would be off on June 20 and June 21. (Doc. 66-5, p. 262).

On June 20, 2013, Mr. Willige emailed Ms. Kirk. The email reads, "Hi: Quenton did NOT come to work today, when we got him on the phone he told us he was on vacation! Do you know anything about this? I have no knowledge of this, the only thing I have is he is off on 6/24/2013." (Doc. 66-5, p. 262). Ms. Kirk emailed Mr. Willige. Her message states:

> I contacted my HR department concerning Quenton's time off. It was
> turned in on May 1st. When I sent the email to you, I failed to list all

dates:  20th, 21st, and 24th.  I apologize for failing to overlook dates as requested [sic].

I will be sure to discuss a new procedure with Quenton when requesting time off.  Procedure will be:

1) fill out [Mental Health Center] leave request form
2) turn into [Mr. Willige] for approval and signature
3) turn into [Ms. Kirk] for approval and signature
4) turn into [Mental Health Center] HR department

. . .

I will coordinate transportation for Friday.

Again, I apologize for the confusion.

(Doc. 66-5, p. 262).

Ms. Kirk also approved Mr. Nunn's request for leave on June 28, 2013, so that Mr. Nunn could attend his annual religious convention.  (Doc. 66-7, pp. 86-87; Doc. 66-5, pp. 265-66).  On June 27, 2013, Ms. Kirk asked a Public Transit employee for Mr. Nunn's June 28, 2013, manifest because she had "a staff member filling in for Quenton."  (Doc. 66-5, p. 266).  When Mr. Willige learned that Ms. Kirk expected Mr. Nunn to be off on June 28, 2013, Mr. Willige emailed Ms. Kirk.  (Doc. 66-5, p. 265).  The email reads:

Quenton has NOT put in to be off for tomorrow!!!  I am the one and only person that handles that, Quenton wants to be off tomorrow because of a convention, the same convention that I have 7 drivers off for!!  If you are letting Quenton off you will have to cover what he is to be doing, for I don't have anyone to cover it, that is the Senior center [sic] also.

(Doc. 66-5, p. 265).[4]  Ms. Kirk responded to Mr. Willige.  Her email states:

> I have Quenton documented off and I remember a personal phone conversation with you approving Quenton's day off (it was several months ago).  We will provide transportation to Day Treatment clients annotated on Quenton's manifest on tomorrow.
>
> . . .
>
> I apologize for the confusion and if I can assist you further please don't hesitate to contact me.

(Doc. 66-5, p. 265).

To arrange other drivers to cover Mr. Nunn's routes on June 20, 2013 and June 28, 2013, Mr. Willige gave Mr. Nunn's manifests to Public Transit dispatchers who evaluated which other drivers had time in their schedules to pick up some of Mr. Nunn's riders.  (Doc. 66-10, ¶ 12).  The dispatchers then contacted the drivers to inform them of the changes, and the drivers evaluated their schedules to determine the most efficient way to complete their manifests.  (Doc. 66-10, ¶ 12).  Some drivers had to work involuntary overtime.  (Doc. 66-10, ¶ 16).

Mr. Nunn testified that no one told him about the new leave approval process that Ms. Kirk implemented in June 2013, but between July 2013 and October 2013, Mr. Nunn requested and received written approval for leave from both Mr. Willige and Ms. Kirk on at least six occasions.  (Doc. 66-5, pp. 268-273; Doc. 66-7, pp. 94-95).

---

[4] In his affidavit, Mr. Willige stated that five of the seven drivers who were off on June 28, 2013 were attending the Jehovah's Witness conference.  (Doc. 66-10, ¶ 13).

According to the City, Public Transit approves leave requests based on a "first come, first serve" policy. (Doc. 66-1, 101; Doc. 66-10, ¶ 9). Mr. Willige testified that he can approve leave for only a certain number of drivers on a given day. This number fluctuates depending on the availability of part-time and full-time drivers to cover all routes. (Doc. 66-10, ¶ 11).

Between December 11, 2013, and January 10, 2014, Mr. Willige received leave requests for five drivers for July 3, 2014, and/or July 7, 2014. Mr. Willige granted these leave requests. (Doc. 66-10, ¶¶ 17-25; Doc. 66-10, pp. 9, 11, 13, 15, 17). Four of those five drivers were attending the Jehovah's Witness conference for which Mr. Nunn also requested leave. (Doc. 66-8, pp. 131-133). Mr. Willige allowed a sixth driver to change his work schedule to accommodate his attendance at the conference. (Doc. 66-10, ¶¶ 21-22).

On January 13, 2014, Mr. Nunn presented a written leave request form to Mr. Willige in which Mr. Nunn requested approval for leave to attend the Jehovah's Witness annual religious conference in July 2014. (Doc. 66-7, p. 90; Doc. 70-7, p. 1; *see also* Doc. 70-6, p. 1). Mr. Nunn asked to be off on July 3, 2014 and July 7, 2014. (Doc. 70-6, p. 1; Doc. 70-7, p. 1). Mr. Willige did not approve Mr. Nunn's religious leave request for July 2014, and he did not sign Mr. Nunn's leave request form. (Doc. 70-2, pp. 158-59; Doc. 70-7, p. 1). According to Mr. Nunn, Mr. Willige told him that he could not sign the form "because if he did,

that meant he was taking full responsibility for that route.  But if Ms. Kirk and I

could find a driver for the route, the same way we did the year prior to that, that he

had no problem with [it]."  (Doc. 66-7, p. 91).

On January 15, 2014, Mr. Willige sent an email to Ms. Kirk.  (Doc. 70-6).

The email reads:

> Hi Maxi:  Quenton came to my office on 1/13/14 requesting off for
> 7/3/14-7/7/14.  This is their annual church gathering that they do
> every year in the summer.
>
> The problem I have is I had 5 employees that put in for this same time
> the week before[.]  At this time I don't have the resources to cover
> Quenton[']s scheduled time for these dates he requested.  If you have
> someone that can cover his schedule for these dates let me know[.]  If
> you can't cover his schedule, I will not be able to let him off for these
> dates.
>
> When it gets closer to these dates I will know more about whether I
> have enough personnel to cover for Quenton[.]  I will do all I can to
> help with this.
>
> I will talk with Quenton to see if we can work something out for
> future times when he has these meetings.
>
> Thank you.

(Doc. 70-6, p. 1).  One hour later, Ms. Kirk responded to the email. (Doc. 70-6).

Her email to Mr. Willige states:

> Thanks for the notification.  It would be great to follow up with me 2
> weeks before their annual meeting, so I can see who could possibly be
> available to cover his route with the center.
>
> Thanks again!

(Doc. 70-6, p. 1).

Mr. Willige did not follow up with Ms. Kirk two weeks before the annual meeting in July 2014 as Ms. Kirk requested in her January 15, 2014 email. (Doc. 66-3, p. 109; Doc. 66-5, pp. 116-17). Mr. Nunn testified that "[o]n numerous occasions" between January and July 2014, he told Mr. Willige that he (Mr. Nunn) and Ms. Kirk had arranged for Greg Fletcher to drive Mr. Nunn's Mental Health clients on July 3 and July 7. (Doc. 66-7, p. 92; *see also* Doc. 66-7, p. 91, 102; Doc. 66-5, pp. 125-26).

On July 2, 2014, Mr. Nunn and Mr. Willige had a conversation about Mr. Nunn's schedule on July 3, 2014 or July 7, 2014. (Doc. 66-7, pp. 105-106; Doc. 66-8, p. 206). Mr. Nunn confirmed that Mr. Fletcher would cover his routes. (Doc. 66-7, p. 107). According to Mr. Nunn, Mr. Willige replied, "I'm going to put a stop to this crap." (Doc. 66-7, p. 107). Mr. Willige does not recall making this statement. (Doc. 66-8, p. 210). Mr. Willige called his supervisor, Kim Garrett. (Doc. 66-7, p. 107; Doc. 66-8, p. 211).[5] Mr. Nunn testified that Mr. Willige told Ms. Garrett that Mr. Nunn had just told him that he (Mr. Nunn) "was going to be off" and "that [Ms. Kirk] had approved it. (Doc. 66-7, p. 107). Mr. Willige told Ms. Garrett that he "knew nothing about it." (Doc. 66-7, p. 107).

---

[5] Ms. Garrett was a division manager for the City's public transportation division. (Doc. 66-1, p. 36). Ms. Garrett has since retired. (Doc. 66-3, p. 10).

On July 2, 2014, Ms. Garrett sent an email to Ms. Kirk. (Doc. 66-5, p. 276). Ms. Garrett copied Tommy Brown, Brian Davis, and Mr. Willige on the email. Mr. Brown is the City's Director of Parking and Public Transportation. Mr. Davis is the Mental Health Center's Executive Director. Ms. Garrett's July 2, 2014 email states:

> Quenton Nunn just left David Willige's office stating that someone else would be driving in his place tomorrow and Monday. We notified you January 15, 2014 that we were not able to give him the okay to take off these two days because other drivers had already been approved for the same time. We were expecting your follow up two weeks ago whether you had someone to relieve him of his Mental Health manifest if you were able to do that however, this is only a portion of the duty Mr. Nunn is assigned to Handi-Ride to perform. We are now left on short notice, to find a driver to fulfill the remainder of his duties on the day before and day after a holiday weekend. This has been a problem with the management of Mr. Nunn's work schedule for at least the past three years. Please, I ask again that you review the terms of the agreement between the Mental Health Center and the City of Huntsville related to the management of Mr. Nunn's work schedule and that you work with us accordingly.
>
> We will send the Mental Health Center portion of Mr. Nunn's manifest to you by email this afternoon. Please see that his replacement only picks up the consumers who are listed on the manifest. We will have other drivers assigned to pick up the Mental Health Center consumers scheduled for transportation who do not appear on the manifest we send to you. If this is unclear don't hesitate to call me.

(Doc. 66-5, p. 276).

Two hours after Ms. Garrett sent her email, Mr. Davis forwarded Ms. Garrett's email to the Mental Health Center's HR director, Leslie Crist. Mr. Davis

copied Ms. Kirk on the email. In his email to Ms. Crist, Mr. Davis stated:

> This email is documentation of Quenton Nunn's decision to take leave without approval. Either I or [Ms. Kirk] can fill you in, but my recommendation is that we terminate Quenton's employment with us next Tuesday (8th) when he returns from his unauthorized leave. I am out of the office tomorrow on the way to Arkansas but we can get with [Ms. Kirk] and all touch base on Monday.

(Doc. 66-5, p. 278). Mr. Davis testified that before he received Ms. Garrett's July 2, 2014 email, he had not considered terminating Mr. Nunn's employment. (Doc. 66-4, p. 96). Ms. Garrett's email "clued [Mr. Davis] in that there was a problem." (Doc. 66-4, p. 97).

On July 7, 2014, Ms. Kirk e-mailed Ms. Garrett and copied Mr. Willige. (Doc. 66-3, p. 182). The email states:

> I have met with the HR Director this morning to discuss Quenton's recent no show for job duties without approved leave.
>
> I along with the support of Brian, [] have decided to terminate Quenton's employment. We plan to meet with Quenton tomorrow morning at 8am. This means Quenton will not report to Handiride tomorrow morning. We are asking for temporary coverage until a driver is hired. Also, traditionally we ask your organization for recommendations to fill this position, if not, I will start the interview process after your response to this email. Again, I apologize for any inconvenience this may cause your organization and I appreciate your cooperation in resolving this matter.

(Doc. 66-3, pp. 182-83). Mr. Willige replied to Ms. Kirk, stating:

> I have a GOOD candidate for you []! Let me know what to do and who to see and we can get this going as soon as you are ready.

(Doc. 66-3, p. 182).

When Mr. Nunn returned from his religious conference, Ms. Kirk called him and asked him to report the Mental Health Center. (Doc. 66-7, p. 113). Ms. Kirk told Mr. Nunn that he was being terminated because he attended the religious conference without receiving written approval from her and from Mr. Willige to take time off. (Doc. 66-5, p. 163; Doc. 66-7, pp. 114-16). Ms. Kirk and Mr. Davis testified that they did not consult anyone with the City before deciding to terminate Mr. Nunn's employment. (Doc. 66-4, pp. 92-93; Doc. 66-5, p. 232).

To cover Mr. Nunn's routes on July 3 and July 7, the City reconfigured other drivers' schedules and required some drivers to work overtime. (Doc. 66-1, p. 151). Mr. Brown testified that "in the scheme of things, [the overtime] wasn't a big amount." (Doc. 66-1, p. 157). The City's annual budget for 2014 was $241,200.000. (Doc. 66-1, p. 176). The City incurred $95.84 in expenses to cover Mr. Nunn's routes on July 3 and $95.84 to cover Mr. Nunn's routes on July 7. (Doc. 66-1, p. 175-76; Doc. 70-10). The City suffered no financial loss due to Mr. Nunn's absences on July 3 and July 7, 2014 because the Mental Health Center reimbursed the City for the expenses. (Doc. 66-1, pp. 177-179).

The City suffered "disruption of schedules and people having to be juggled from one schedule to the other," but all of the City's Handi-Ride passengers who needed transportation on July 3 and July 7 received rides. (Doc. 66-1, p. 151; *see* Doc. 66-1, pp. 149-50). Mr. Brown testified that "[w]e were able to get the job

done and we were able to get people to where they needed to get to." (Doc. 66-1, p. 151). Mr. Willige testified that he received complaints from Handi-Ride passengers about delayed routes and missed appointments on July 3 and July 7, but the City has not produced records documenting those complaints. (Doc. 66-3, pp. 76-77; Doc. 66-8, pp. 166-71, 174, 176). Mr. Brown testified that he is not aware of complaints from customers. (Doc. 66-1, p. 157). Ms. Garrett testified that she is "not aware of any specific problems on those days." (Doc. 66-3, p. 77).

## III. ANALYSIS

### A. Title VII and § 1983 Religious Discrimination: Failure to Accommodate

Mr. Nunn contends that the City violated Title VII and § 1983 because the City did not accommodate his request to attend the Jehovah's Witness convention in July 2014. The Court analyzes Mr. Nunn's Title VII and § 1983 failure to accommodate claims together under the same framework. *Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) ("Title VII and § 1983 claims have the same elements where the claims are based on the same set of facts, and in such cases, the claims are subject to the same legal analysis.") (internal quotation marks and alteration omitted); *Hardin v. Synchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982) ("When section 1983 is used as a parallel remedy for violation of section 703 of Title VII the elements of the two causes of action are the same.").

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate [] an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Historically, the Eleventh Circuit has applied a burden shifting analysis to Title VII religious failure to accommodate claims. *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) ("In religious accommodation cases, we apply a burden-shifting framework akin to that articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)."). Under this framework, the Eleventh Circuit has held that a plaintiff may establish a prima facie case by demonstrating that "(1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for failing to comply with the conflicting employment requirement." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007) (internal

quotation marks omitted); *see also Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 855 (11th Cir. 2010).

The Supreme Court recently explained that "the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015). The Supreme Court stated:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual ... because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious ... practice," it is no response that the subsequent "fail[ure] ... to hire" was due to an otherwise-neutral policy. Title VII requires otherwise neutral policies to give way to the need for an accommodation.

135 S. Ct. at 2034.[6]

---

[6] In *Abercrombie,* the Supreme Court held that a plaintiff "need only show that his need for an accommodation was a motivating factor in the employer's decision." *Abercrombie*, 135 S. Ct. at 2032. Actual knowledge of the need for an accommodation is not required; an employer may merely suspect that an employee has a particular religious observance or practice, and the employer may be liable if that suspicion motivates an employment decision. *Id.* This aspect of the *Abercrombie* decision is at odds with the second element in the Eleventh Circuit test for a prima facie showing in a religious accommodation case. Post-*Abercrombie*, at least one district court in this Circuit has questioned the continued viability of the second and third elements of the Eleventh Circuit's test for a prima facie case in religious accommodation cases. *See Walker v. Indian River Transp. Co.*, 2017 WL 388921, * 3 (M.D. Fla. Jan. 27, 2017) (explaining that in light of *Abercrombie*'s holding that an employer need not know of the need for an accommodation, the second element is "suspect if not completely eliminated," and seemingly, "the third element is more appropriately stated as: the employer made the plaintiff's religious

If a plaintiff establishes a prima facie case, then "the burden shifts to the defendant to 'demonstrate[] that he is unable to reasonably accommodate [] an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.'" *Morrissette-Brown*, 506 F.3d at 1321.

Mr. Nunn has established the first two elements of his prima facie case. Mr. Nunn testified that his responsibilities as an elder at his Jehovah's Witness Kingdom Hall required his attendance at an annual conference in July 2014 on two scheduled work days. (Doc. 66-7, pp. 21-22, 81; *see* Doc. 70-6, p. 1). The City has presented no evidence to contradict Mr. Nunn's testimony. Thus, Mr. Nunn has shown that he had a bona fide religious belief that conflicted with an employment requirement. On January 13, 2014, Mr. Nunn presented a written leave request form to Mr. Willige to ask for permission to be off work July 3, 2014 and July 7, 2014, so that he could attend the Jehovah's Witness conference. (Doc. 66-7, p. 90; Doc. 70-6, p. 1; Doc. 70-7, p. 1). In a January 15, 2014 email to Ms.

---

practice a factor in an adverse employment decision," or in order words, "the employer may not take an adverse action with the motive of avoiding the need for accommodating a religious practice."). In the only religious failure to accommodate case that the Eleventh Circuit has decided post-*Abercrombie*, the Court of Appeals, in an unpublished opinion, reiterated that to succeed on his prima facie case, a plaintiff must show that he informed his employer of his bona fide religious belief and that he was discharged for failing to comply with an employment requirement that conflicted with the religious belief. *Patterson v. Walgreen Co.*, --- Fed. Appx. ----, 2018 WL 1224391, *2 (11th Cir. Mar. 9, 2018). The Court does not have to attempt to reconcile *Abercrombie* and *Morrissette-Brown* in this case because it is undisputed that Mr. Willige and Ms. Kirk knew of Mr. Nunn's religious practice and his need for an accommodation.

Kirk, Mr. Willige acknowledged that he understood that Mr. Nunn had requested time off to attend a religious conference. (Doc. 70-6, p. 1). Mr. Willige also testified that he knew that Mr. Nunn and at least four other City paratransit drivers are Jehovah's Witnesses and that Mr. Nunn and the other Jehovah's Witness employees had requested time off for the summer conference since at least 2010. (Doc. 66-8, p. 133).

The City contends that Mr. Nunn cannot establish a prima facie case because he has not presented facts showing that the City disciplined or discharged him. According to the City, the City cannot be liable because the Mental Health Center was Mr. Nunn's employer, and the Mental Health Center, not the City, terminated Mr. Nunn's employment.

Mr. Nunn argues that the City is liable for his termination under a "joint employer" theory. "[M]ultiple entities can serve as 'joint employers' for Title VII purposes." *Scott v. Sarasota Doctors Hospital, Inc.*, 688 Fed. Appx. 878, 886 (11th Cir. 2017) (citing *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359-61 (11th Cir. 1994)). The Eleventh Circuit has explained that two entities are joint employers when:

> one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus the joint employer concept recognizes that the business entities involved are in fact separate but

that they share or co-determine those matters governing the essential terms and conditions of employment.

*Peppers v. Cobb County, Georgia*, 835 F.3d 1289, 1300 (11th Cir. 2016) (quoting *Virgo*, 30 F.3d at 1360, quoting in turn *N.L.R.B. v. Browning–Ferris Indus.*, 691 F.2d 1117, 1122 (3d Cir. 1982)).

The City does not argue that it is not a joint employer, and the Court finds that Mr. Nunn has presented sufficient evidence from which a reasonable jury could conclude that the City was a joint employer with the Mental Health Board. The City and the Mental Health Board entered a contract to provide transportation services to City Handi-Ride passengers and Mental Health Board clients, and the Mental Health Board hired Mr. Nunn to perform this service. (Doc. 66-2, pp. 6-23). Pursuant to the contract, Mr. Nunn had to meet Public Transit's employment criteria. (Doc. 66-2, pp. 9, 18). Mr. Willige managed Mr. Nunn's "day-to-day" responsibilities. (Doc. 66-2, pp. 9, 18). Public Transit provided Mr. Nunn with his daily passenger list. (Doc. 66-2, ¶ 7; *see* Doc. 66-2, pp. 25-36; Doc. 66-7, pp. 56-57). Mr. Nunn had to work the Public Transit schedule, and Mr. Willige had to approve Mr. Nunn's scheduled leave. (Doc. 66-2, pp. 9, 18). From this evidence, a jury could determine that the City had "actual control" or "the authority or power to control" the terms and conditions of Mr. Nunn's employment. *See Virgo*, 30 F.3d at 1360

Citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236 (11th Cir. 1998), the City contends that "[i]f joint employers are involved, if one joint employer has no[] control over the adverse employment action, then that joint employer cannot be liable." (Doc. 76, p. 8). *Llampallas* does not assist the City. In that case, the Eleventh Circuit explained that the single and joint employer theories "concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Llampallas*, 163 F.3d at 1244-45. The Court of Appeals found that the entity at issue could not be held liable for terminating the plaintiff because the entity "had nothing to do with" the termination decision. *Llampallas*, 163 F.3d at 1245. In making that finding, the Eleventh Circuit explained that the entity "had no interaction with" the other company's employees; the entity "made no decisions that affected the terms and conditions of employment at" the other company; and the entity "was completely uninvolved in the operation of" the other company. *Llampallas*, 163 F.3d at 1245.

Here, Mr. Nunn has presented evidence from which a fact-finder reasonably could conclude that the City had interaction with the Mental Health Center; that the City made decisions that affected the terms and conditions of Mr. Nunn's employment with the Mental Health Center; and that the City was involved in the operation of the Mental Health Center's transportation of its clients. *See* p. 21 above. These facts distinguish this case from the facts in *Llampallas*.

Moreover, the finding in *Llampallas* that the joint employer theory focuses "on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based," 163 F.3d at 1244-45, is uncertain in light of the Eleventh Circuit's recent decision in *Peppers v. Cobb County, Georgia*, 835 F.3d 1289 (11th Cir. 2016). In *Peppers*, the plaintiff argued that Cobb County, Georgia was a joint employer with the county's District Attorney's Office because the County issued the plaintiff's paycheck using county funds. Therefore, according to the plaintiff, "the County was the entity in control of the fundamental aspects of the employment relationship that gave rise to the claim, and thus should be exposed to liability under Title VII because this is a case centered on disparities in compensation." *Peppers*, 835 F.3d at 1300 (internal quotation marks omitted).

The Eleventh Circuit rejected the plaintiff's argument "because the focal point of the [joint employer] inquiry is not which entity controlled the specific aspect of the relationship giving rise to a discrimination claim, but rather which entity or entities controlled the fundamental and essential aspects of the employment relationship when taken as a whole." *Peppers*, 835 F.3d at 1300. According to the *Peppers* Court, "[w]hichever entity (or entities) predominantly controls the terms of the relationship may be found liable under Title VII." *Peppers*, 835 F.3d at 1300.

The record supports the City's contention that Mental Health Center did not consult Mr. Willige, Ms. Garrett, or anyone from the City before deciding to terminate Mr. Nunn's employment and that the City had no direct involvement in the termination decision. (Doc. 66-1, p. 97; Doc. 66-4, pp. 92-93; Doc. 66-5, pp. 219-20). Still, under *Peppers*, because Mr. Nunn has presented evidence that supports his contention that the City predominantly controlled the terms of his employment relationship with the Mental Health Center, *see* p. 21 above, the City may be liable.[7]

Because Mr. Nunn has established a prima facie case, the burden shifts to the City to demonstrate that it could not reasonably accommodate Mr. Nunn's request for leave on July 3 and July 7 without undue hardship. 42 U.S.C. § 2000e(j); *see Walden*, 669 F.3d at 1293 ("An employer has a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.'") (quoting *Trans World Airlines, Inc., v. Hardison*, 432 U.S. 63, 75 (1977)). Title VII does not define "undue hardship." *Beadle v. Hillsborough Cty. Sheriff's Dept.*, 29 F.3d 589, 592 (11th Cir. 1994). "Thus, the precise reach of the employer's obligation to its employee is unclear

---

[7] Mr. Nunn argues alternatively that the City, as a non-employing entity, may be liable under Title VII for interfering with his employment with the Mental Health Center. (Doc. 72, pp. 17-18) (citing *Pardazi v. Cullman Medical Center*, 838 F.2d 1155 (11th Cir. 1988), and *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291 (11th Cir. 1988)). Because the Court finds that questions of fact exist regarding the City's liability as a joint employer, the Court does not analyze Mr. Nunn's claims under his alternative theory.

under the statute and must be determined on a case-by-case basis." *Beadle*, 29 F.3d at 592.

According to the Supreme Court, an undue hardship is one that requires an employer "to bear more than a *de minimis* cost" to accommodate a religious request. *Trans World Airlines*, 432 U.S. at 85. The Supreme Court "has also recognized that the phrase '*de minimis* cost' entails not only monetary concerns, but also the employer's burden in conducting its business." *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995) (citing *Trans World Airlines*, 432 U.S. at 84 n.15).

The City contends that it could not reasonably accommodate Mr. Nunn's leave request because the City had no back up or part-time drivers available on July 3 and July 7, and Mr. Nunn's absence on those days required the City to re-schedule routes and adjust the schedules of other City drivers. (Doc. 66-1, p. 152; Doc. 66-10, ¶ 2). In addition, according to the City, some of those drivers who worked on July 3 and July 7 had to work overtime to ensure that Mr. Nunn's Handi-Ride passengers received transportation. (Doc. 66-1, p. 151). It cost the City $95.84 each day to cover Mr. Nunn's routes on July 3 and July 7. (Doc. 66-1, p. 175-76; Doc. 70-10). The Mental Health Center reimbursed the City for the expenses. (Doc. 66-1, pp. 157, 177-179). Mr. Willige testified that some passengers complained about delayed bus schedules and missed appointments on

July 3 and July 7, but his supervisors are not aware of complaints, and there is no documentation to support Mr. Willige's report of complaints. *See* p. 16, above. Mr. Nunn has presented evidence that all of the City's Handi-Ride passengers who needed transportation on July 3 and July 7 received rides despite Mr. Nunn's absence. (Doc. 66-1, pp. 149-51).

The disputed evidence with respect to the question of undue hardship creates questions of fact that a jury must resolve. Accordingly, neither party is entitled to judgment as a matter of law on Mr. Nunn's Title VII and § 1983 religious failure to accommodate claim.

### B.   § 1983 First Amendment Retaliation

To establish a First Amendment retaliation claim, a plaintiff must show that "(1) h[is] speech or act was constitutionally protected; (2) []he suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." *Trigo v. City of Doral*, 663 Fed.Appx. 871, 874 (11th Cir. 2016) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). If a plaintiff establishes the first three elements, then the burden "shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech." *Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005); *see also Smith v. Mosley*, 532 F.3d

1270, 1278 (11th Cir. 2008) ("If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail . . . on summary judgment.") (internal quotation marks and citation omitted).

For purposes of this opinion, the Court assumes without deciding that Mr. Nunn has established the first three elements of the § 1983 First Amendment retaliation test; however, on the record before the Court, the City is entitled to judgment as a matter of law on this claim because the City has demonstrated that it would have taken the same action regardless of Mr. Nunn's request for leave and attendance at the religious conference.[8]

When Mr. Nunn approached Mr. Willige in January 2014 to discuss his (Mr. Nunn's) request for time off to attend the conference in July 2014, Mr. Willige already had approved five other drivers' requests for time off to attend the conference and had approved time off for one other driver for one of the days that Mr. Nunn requested leave.  (Doc. 66-10, ¶¶ 17-25; Doc. 66-10, pp. 9, 11, 13, 15, 17; Doc. 66-8, pp. 130-31).  The City follows a "first come, first serve" policy with respect to driver leave requests.  (Doc. 66-1, 101; Doc. 66-10, ¶ 9).  The City approves only a certain number of drivers for leave on a given day, depending on the availability of part-time and full-time drivers to cover all routes.  (Doc. 66-10, ¶ 11).  The City did not approve Mr. Nunn's request because "other drivers had

---

[8] Mr. Nunn makes no argument concerning this element of the burden-shifting test for a First Amendment retaliation claim.  (*See* Doc. 72, pp. 19-20).

already been approved for the same time." (Doc. 66-3, p. 185). Mr. Nunn has not presented evidence to dispute the City's evidence which demonstrates that the City would have denied Mr. Nunn's leave request regardless of the reason for the leave because so many drivers already were scheduled to be off work by the time Mr. Nunn submitted his leave request.

To the extent that Mr. Nunn bases his First Amendment retaliation claim on his argument that Ms. Garrett's July 2 email prompted the Mental Health Center's decision to terminate his employment, Mr. Nunn's claim fails. Ms. Garrett testified that there was an "ongoing issue with Mr. Nunn requesting leave to take off, period. Not just [for] the church meetings." (Doc. 66-3, p. 96). Ms. Garrett explained that "this type of short notice and the confusion over [Mr. Nunn's] leave was an ongoing problem, and often [the City] did not know ahead of time when he going to take off for anything, any vacation, sick leave, or anything." (Doc. 66-3, p. 108).

This testimony is consistent with an email that Ms. Garrett sent to Ms. Kirk regarding confusion over Mr. Nunn's leave request in June 2013, a request that was not related to a religious convention. (*See* Doc. 66-3, p. 190 (June 27, 2013 email from Ms. Garrett to Ms. Kirk stating, "We worked through a similar situation last week and you sent us assurance that you were adopting procedures to make sure this didn't happen again. . . .")). This email is consistent with Ms.

Garrett's July 2, 2014 email to Ms. Kirk in which she repeated frustration with the handling of Mr. Nunn's schedule:

> We are now left on short notice, to find a driver to fulfill the remainder of his duties on the day before and day after a holiday weekend. This has been a problem with the management of Mr. Nunn's work schedule for at least the past three years. Please, I ask again that you review the terms of the agreement between the Mental Health Center and the City of Huntsville related to the management of Mr. Nunn's work schedule and that you work with us accordingly.

(Doc. 66-5, p. 276).

In her July 2, 2014 email, Ms. Garrett explained that for at least three years, the City had not received sufficient notice concerning Mr. Nunn's leave, and she asked Ms. Kirk to work with the City consistent with the terms of the contract relating to Mr. Nunn's schedule. The Mental Health Board may bear sole responsibility for the insufficient notice (that certainly was true in some instances). The record reflects that because of the inadequate notice, Ms. Garrett would have sent the same email "in the absence of the protected conduct." Therefore, the Court will enter judgment as a matter of law in favor of the City on Mr. Nunn's First Amendment retaliation claim. *See e.g., Smith*, 532 F.3d at 1278.

## C. Title VII Retaliatory Discharge

Mr. Nunn asserts a retaliation claim against the City under Title VII based on his allegation that the City terminated his employment or caused the Mental

Health Center to terminate his employment because he requested leave to attend the July 2014 religious conference. (Doc. 72, p. 22).

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . under [Title VII]." 42 U.S.C. § 2000e-3(a). Absent direct evidence, the *McDonnell Douglas* burden-shifting analysis applies to retaliation claims. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).[9]

Under this framework, a plaintiff must present evidence to establish a prima facie case of retaliation, which "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry*, 431 F.3d 788, 794 (11th Cir. 2005). "To establish a prima facie case of retaliation under Title VII, 'the plaintiff must show (1) that []he engaged in statutorily protected expression; (2) that []he suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).

---

[9] "Direct evidence is 'evidence, that, if believed proves the existence of a fact without inference or presumption.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (alteration in original omitted). Mr. Nunn does not argue that he produced direct evidence of retaliation. (*See* Doc. 72, pp. 21-23).

If a plaintiff establishes a prima facie case, then employer "may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Furcron*, 843 F.3d at 1310 (internal quotation marks omitted). If the employer meets this burden, then, to survive summary judgment, a plaintiff must "demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual." *Furcron*, 843 F.3d at 1311; *see also Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'") (quoting *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)).

Though it is one tool for examining evidence of discriminatory intent, "'the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases." *Flowers v. Troup Cty., Ga., School Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). A convincing mosaic

of circumstantial evidence may be sufficient to allow a jury to infer that retaliatory intent motivated an employment decision. *Lockheed-Martin Corp.*, 644 F.3d at 1328; *see also Calvert v. Doe*, 648 Fed. Appx. 925, 929 (11th. Cir. 2016) (applying the "convincing mosaic" standard to a Title VII retaliation claim).[10]

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017) (internal quotation marks and citation omitted). If the circumstantial evidence supports a reasonable inference that the employer retaliated against the plaintiff, then summary judgment is improper. *Calvert*, 648 Fed. Appx. at 929; *see also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) ("Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'") (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

---

[10] *Calvert* is not binding authority, but the Court cites the decision for its persuasive value. *See United States v. Rodrigues-Lopez*, 363 F.3d 1134, 1138 n.4 (11th Cir. 2004) ("While unpublished opinions are not binding on this court, they may nonetheless be cited as persuasive authority."); *see also* 11th Cir. Rule 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

"[R]equesting a religious accommodation and refusing to work due to First Amendment religious exercise is 'protected activity.'" *Williams v. Wal-Mart Associates Inc.*, 2013 WL 979103, at *3 (N.D. Ala. Mar. 8, 2013) (citing *Richardson v. Dougherty Cnty., Ga*, 185 Fed. Appx. 785, 790 (11th Cir. 2006) (treating a request for religious accommodation as protected expression)); *see also Creusere v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 88 Fed. Appx. 813, 821 (6th Cir. 2003) ("Creusere was clearly engaged in a protected activity by requesting religious accommodation . . . ."); *Porter v. City of Chicago*, 700 F.3d 944, 957 (7th Cir. 2012) ("Porter engaged in statutorily protected activity, including her request . . . for a schedule adjustment to attend ministry classes . . . ."). The record is undisputed that Mr. Nunn requested leave in January 2014 to attend a religious conference. Therefore, Mr. Nunn engaged in protected activity.

Because Mr. Nunn has established the first element of his prima facie case, Mr. Nunn "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted). Mr. Nunn's termination is a materially adverse employment action. *See Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir.

2016) (recognizing that termination of employment constitutes materially adverse employment action for purposes of retaliation claim).[11]

Because Mr. Nunn has established that he engaged protected activity and suffered an adverse employment action, Mr. Nunn must demonstrate a causal connection between his request for leave and his termination. The causation requirement is interpreted broadly. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). A plaintiff can show a causal connection "by showing close temporal proximity between the statutorily protected activity and the adverse employment action[, . . . b]ut mere temporal proximity, without more, must be 'very close.'" *Thomas*, 506 F.3d at 1364 (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (internal citation omitted); *see Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence tending to show causation, a three-and-one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation."). Evidence

---

[11] Because questions of fact exist concerning whether the City is a joint employer for purposes of Title VII, *see* pp. 20-24 above, the Court is not persuaded by the City's argument that it cannot be liable for Title VII retaliation because it did not take an adverse action against Mr. Nunn. (*See* Doc. 67, pp. 15-17; Doc. 81, pp. 7-8).

of temporal proximity is not the only way to prove causation; a mosaic of circumstantial evidence will suffice if the circumstantial evidence is sufficient to raise a reasonable inference that the employer retaliated against the plaintiff. A plaintiff must proffer evidence "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Southwestern Med. Center v. Nassar*, 570 U.S. 338, 352 (2013); *see also Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016).

Mr. Nunn has established that Mr. Willige knew about Mr. Nunn's request for leave when the Mental Health Center terminated Mr. Nunn's employment, and Mr. Nunn has presented a mosaic of circumstantial evidence to create a jury question regarding the causal link element of his prima facie case, even though nearly six months elapsed between his initial January 2014 leave request and his July 2014 termination. On July 2, 2014, although Mr. Willige and Mr. Nunn did not expressly discuss the reason that Mr. Nunn would not work on July 3 and July 7, the evidence viewed in the light most favorable to Mr. Nunn, demonstrates that Mr. Willige clearly understood that he and Mr. Nunn were discussing leave related to the upcoming religious conference.

Mr. Willige knew that Mr. Nunn and a number of other drivers attended the conference every summer in June or July. (Doc. 66-8, p. 133; Doc. 70-6, p. 1). The email chain that culminated in Ms. Garrett's email to the Mental Health

Center, which in turn triggered Mr. Nunn's termination, begins with Mr. Willige's report to Ms. Kirk that Mr. Nunn and a number of other drivers were requesting leave "7/3/14-7/7/14. This is their annual church gathering that they do every year in the summer." (Doc. 70-6, p. 1). Between January and July 2014, Mr. Nunn told Mr. Willige "[o]n numerous occasions" that Mr. Fletcher would drive Mr. Nunn's Mental Health clients on July 3 and July 7. (Doc. 66-7, p. 92; *see also* Doc. 66-7, p. 91, 102; Doc. 66-5, pp. 125-26). On July 2, 2014, Mr. Nunn and Mr. Willige discussed again that Mr. Fletcher would cover Mr. Nunn's Mental Health routes on July 3 and July 7 to which Mr. Willige responded, "I'm going to put a stop to this crap." (Doc. 66-7, p. 107). Mr. Willige then called Ms. Garrett, and Ms. Garrett emailed Ms. Kirk. (Doc. 66-7, p. 107; Doc. 66-8, p. 211; Doc. 66-5, p. 276).

Ms. Kirk's email stated that the City notified Mental Health on January 15, 2014 (two days after Mr. Nunn submitted his leave request to Mr. Willige), that the City did not approve Mr. Nunn's leave on July 3 and July 7 because the City already had approved other drivers for the same days off. (Doc. 66-5, p. 276). Ms. Garrett expressed frustration with Mental Health's "management of Mr. Nunn's work schedule for at least the past three years" and asked Ms. Kirk to please review and comply with the terms of the contract governing Mr. Nunn's schedule. (Doc. 66-5, p. 276). Mr. Davis testified that Ms. Garrett's email "clued [him] in that there was a problem," and before he received Ms. Garrett's July 2,

2014 email, he had not considered terminating Mr. Nunn's employment. (Doc. 66-4, pp. 96, 97).

From this circumstantial evidence, Mr. Nunn has created a question of fact regarding a causal connection between his request for leave and his termination and has established a viable prima facie case of retaliation. In their summary judgment briefs, neither party moved beyond a discussion of Mr. Nunn's prima facie case. The Court offers the parties an opportunity to address the law and the related evidence that pertains to the remaining prongs of Mr. Nunn's retaliation claim.

## IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** the parties' cross motions for summary judgment. (Doc. 67; Doc. 71). The Court enters judgment as a matter of law in favor of the City on Mr. Nunn's § 1983 First Amendment retaliation claim. The Court **DISMISSES** that claim **WITH PREJUDICE**.

The Court **SETS** Mr. Nunn's Title VII and § 1983 religious failure to accommodate claim for a jury trial at **9:00 a.m.** on **Tuesday, June 26, 2018** in the second floor courtroom, United States District Court, 101 Holmes Ave., Huntsville, AL 35801. By separate order, the Court will provide the parties with pre-trial instructions.

**On or before April 16, 2018**, the parties shall please file, consistent with the Court's instructions above, supplemental briefs of no more than 10 pages concerning Mr. Nunn's Title VII retaliation claim.[12]

**DONE** and **ORDERED** this March 27, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[12] The parties shall not include a separate facts section in their briefs, but the parties may incorporate relevant facts from the summary judgment record, as necessary, to support their legal argument.